FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
## for the
### District of New Mexico

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)   Case No. **22mr1874**
1720 Avenida Real Northwest )
Albuquerque, New Mexico 87105 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g)(1) and 924(c); 21 U.S.C. §§ 841(a)(1) and 846 | Possession of a Firearm by a Convicted Felon; Possession of a Firearm in Furtherance of a Drug Trafficking Crime; Possession with Intent to Distribute Controlled Substance; and Conspiracy to PWID |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jordan Spaeth, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:  12/15/2022

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

B. Paul Briones, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

### INTRODUCTION

1.        I, Jordan Spaeth, Special Agent of the Federal Bureau of Investigation ("FBI"), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence of Luis MONTOYA, a.k.a. "Demon" ("MONTOYA"), and Angelique PENA-CHAVEZ, a.k.a. "Lonely Girl," ("PENA-CHAVEZ"), 1720 Avenida Real Northwest, Albuquerque, New Mexico ("Subject Premises"). I am requesting a warrant to search the Subject Premises for the items listed in Attachment B, which has been attached hereto and incorporated herein by reference.

2.        A more detailed description and photographs of the Subject Premises are contained within Attachment A, which has been attached hereto and incorporated herein by reference.

### PURPOSE OF THE AFFIDAVIT

3.        The FBI's Violent Gang Task Force ("VGTF") has recently become aware of MONTOYA and PENA-CHAVEZ's role as a drug source of supply to the Brew Town Locos ("BTL") gang.

4.        Based on the facts and information contained herein, I believe the Subject Premises contains evidence, fruits, and instrumentalities of violations of:

   a.   21 U.S.C. §§ 841(a)(1) and 846 Distribution and Possession with Intent to Distribute Controlled Substances and Conspiracy Thereto;

   b.   18 U.S.C. §§ 922(g)(1) and 924 Possession of a Firearm and Ammunition by a Convicted Felon; and

   c.   18 U.S.C. § 924(c) Possession of a Firearm in Furtherance of a Drug Trafficking Crime (hereinafter the "target offenses").

5.        I am submitting this affidavit based upon my experience and familiarity with the investigation of the BTL. This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested location and persons, as well as relevant background information. During my investigation, I have developed information I believe to be reliable from the following sources:

   a.   New Mexico Corrections Department ("NMCD"), Bernalillo County Metropolitan

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Detention Center ("MDC"), VGTF task force officers, and other law enforcement or corrections officials (also referred to herein as "agents"), including oral and written reports;

b.  Results of physical surveillance;

c.  Information provided by undercover agents;

d.  Information provided by Confidential Human Sources ("CHS");

e.  Information provided by Cooperating Defendants ("CD");

f.  Records from the FBI National Crime Information Center ("NCIC"), New Mexico Courts, and the New Mexico Motor Vehicle Division.

6.      Where I refer to conversations herein, they are related in substance and, in part, based on conversations between fellow agents, task force officers, other law enforcement personnel, or confidential human sources that assisted law enforcement. Any observations referenced herein that I did not personally witness were relayed to me in oral and/or written reports by agents of the FBI or other agencies. All figures, times, and calculations set forth herein are approximate.

## AFFIANT'S RELEVANT TRAINING AND EXPERIENCE

7.      I am a Special Agent with the FBI and have been a sworn law enforcement officer for approximately 14 years, serving as a police officer and FBI Special Agent. I have been with the FBI since 2018 and am currently assigned to the VGTF. As a member of the VGTF my primary responsibility is to investigate criminal enterprises involving violent repeat offenders and gang members who participate in murder, narcotics violations, firearms violations, human trafficking, robberies, and other violations of federal law. Prior to my current assignment I was assigned to the Violent Crime Task Force and also worked violent felony crimes which were committed on the multiple Indian Reservations/Pueblos surrounding Albuquerque.

8.      My investigative training and experience includes, but is not limited to, interviewing subjects, targets, and witnesses, writing affidavits for, and executing search and arrest warrants, collecting evidence, conducting surveillance, and analyzing public records. Over the course of my career, I have

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

arrested several hundreds of persons for offenses relating to armed robberies, firearm violations, bank robberies, illegal narcotics, and other criminal conduct. I have also been responsible for serving subpoenas and supervising cooperating sources, as well as analyzing phone records.

9.      Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations ("DTO"s), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances and firearms. I am also familiar with how those individuals and organizations hide the substantial profits generated from their criminal activities. I am aware that those individuals conceal firearms on their person as well as evidence of their drug trafficking, to include illegal narcotics and large amounts of United States Currency.

10.      I know that firearms are tools of the trade and instrumentalities of the crime of drug trafficking, particularly in instances involving subjects who have committed prior violent crimes and/or firearms violations. It has been my experience that criminals who illegally possess firearms often do not part with such firearms, as it may be difficult for criminals to acquire them. I know that gang members often possess firearms on or near their person, in their vehicles and residences.  I know that individuals who are prohibited from possessing firearms know they are not allowed to possess those firearms, therefore they will secrete those firearms within their vehicles, outbuildings, or residences.

11.      It has been my experience that individuals engaged in drug trafficking and gang activities possess firearms to facilitate their illegal activities. I am aware that members of DTO's and gang members often possess firearms to protect the often substantial profits from selling narcotics. Also, I have learned that gang members possess firearms to threaten other individuals and assault other gang members in an effort to establish their gang as powerful and successful.

12.      Based upon my training, experience, and participation in gang/criminal enterprises and DTO's, I am aware individuals engaged in drug trafficking maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends, or associates, in their business locations, or in stash houses. This documentary evidence includes telephone numbers, address books, travel receipts,

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

13.     I know that members and associates of gang/criminal enterprises and DTOs often make substantial profits from their drug trafficking ventures. Often times, individuals engaged in drug trafficking do not deposit their profits into the bank so as to avoid detention by law enforcement. I know that individuals engaged in drug trafficking often keep large amounts of United States Currency at their residence. Along with United States Currency, I know that members engaged in drug trafficking may purchase expensive jewelry with their drug proceeds to avoid detection. Therefore, I know that members engaged in drug trafficking may have expensive jewelry which is the result of their drug trafficking operations.

14.     Individuals engaged in drug trafficking are weary of law enforcement surveillance as well as other criminals who would steal their drugs or drug trafficking proceeds. Therefore, I know individuals engaged in drug trafficking to use surreptitious and overt video and audio recording devices at their residences, store video and audio recordings in hard drives or other electronic storage devices and have real-time access to video and audio surveillance via applications on their smartphones.

15.     I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I have observed incarcerated members of gang/criminal enterprises utilize non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood institutional gang investigators will monitor the call. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles,

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

real property, and utility services, in an effort to avoid detection by law enforcement.

16.     In addition, I am also familiar with the use of text messaging, instant messaging, social media, and other messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities.

17.     I have learned individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities on their person or in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports, and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. Such evidence includes controlled substances, packaging materials such as baggies, rubber bands, shrink wrap, heat sealers, and drug presses, other drug use and trafficking paraphernalia such as pipes and scales.

18.     It has been my experience members of gang/criminal enterprises and DTOs often maintain records of their transactions in a similar manner to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, in either hard copy or electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

19.     I have learned individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

### BIOMETRIC ACCESS TO DEVICES

20.     Based on my experience, I am aware gang/criminal enterprises and drug traffickers utilize cellular telephones to exchange information, photographs, and felonious communications, to include the names and locations of informants, witnesses, victims. I have also observed gang members discuss the acquisition and distribution of firearms to and from other members, as well as discussions about gang related assaults.

21.     I know from my training and experience investigating criminal gangs and drug trafficking organizations that cellular telephones contain evidence of criminal conduct. More specifically, it has been my experience that cellular telephones are utilized to communicate drug prices, availability, quantity, and the contact information for customers and suppliers. I have also discovered photographs of controlled substances and firearms on cell phones.

22.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

a.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

b.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

c.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

device are engaged in criminal activities and thus have a heightened concern about securing the device.

e.   As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.   Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the Target Subjects to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

of Target Subjects and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of Target Subjects and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that Target Subjects state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

### THE TARGET SUBJECTS

23.    I am aware that MONTOYA has an active felony warrant for Receiving or Transferring Stolen Vehicles or Motor Vehicles, in the Bernalillo County Metropolitan Court, case T-4-FR-2022-5366. I have reviewed MONTOYA's criminal history, I am aware that he has been arrested 18 times in New Mexico and has been convicted of the following felony offenses:

a.    Possession with Intent to Distribute 50 Kilograms and more of a Mixture and Substance Containing a Detectable Amount of Marijuana and Aiding and Abetting, by guilty plea on December 23, 2009, in the United States District Court for the District of New Mexico, case number 2:09-CR-03663.

b.    Possession of a Controlled Substance (felony), by guilty plea on December 9, 2014, in the Bernalillo County District Court, case number D-202-CR-2013-01293,

c.    Receiving or Transferring Stolen Motor Vehicles (1st Offense), by guilty plea on December 9, 2014, in the Bernalillo County District Court, case number D-202-CR-2014-00186,

d.    Dealing in Credit Cards of Another, by guilty plea on December 9, 2014, in the Bernalillo County District Court, case number D-202-CR-2014-00288,

e.    Residential Burglary and Unlawful Taking of a Motor Vehicle (1st Offense), by guilty

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

plea on December 9, 2014, in the Bernalillo County District Court, case number D-202-CR-2014-00607.

24.     I am aware that PENA-CHAVEZ has an active felony warrant for Trafficking Controlled Substances (Manufacturing)(1st Offense), in the Bernalillo County District Court, case D-202-CR-2022-01639. I have reviewed PENA-CHAVEZ's criminal history, I am aware that she has been arrested 17 times in New Mexico and I do not believe she is a convicted felon.

25.     VGTF agents spoke with officers from the NMCD Security Threat Intelligence Gang Unit ("STIU") who advised they were familiar with PENA-CHAVEZ and MONTOYA. STIU officers advised PENA-CHAVEZ and MONTOYA were currently wanted for felony offenses, they were in a relationship and living together. Further, STIU officers advised that PENA-CHAVEZ was a suspected Brew Town Locos gang member and MONTOYA was a suspected West Side Locos gang member.

### PROBABLE CAUSE

26.     Within the last week and a half, VGTF agents spoke with a cooperating defendant ("CD") who advised that PENA-CHAVEZ, a BTL gang member, and "DEMON" (later identified as MONTOYA) trafficked narcotics out of the Subject Premises. CD advised that within the last six months they had been to the Subject Premises more than a dozen times and every time they were at the residence they had observed various amounts of narcotics. CD further advised that they had observed PENA-CHAVEZ and MONTOYA traffic narcotics from the Subject Premises. CD had last been to the Subject Premises during the week of November 1, 2022. CD believed MONTOYA and PENA-CHAVEZ to possess firearms inside the Subject Premises. [1]

27.     On December 6, 2022, VGTF agents spoke with an FBI confidential human source

---

[1] CD is a self-admitted gang member and a close associate to experienced gang members and drug traffickers. CD has provided assistance in one other FBI investigation. CD was arrested by the FBI and is motivated to assist the FBI in hopes to receive a positive recommendation in a pending criminal matter. I believe the information provided by CD to be reliable because much of it has been corroborated by independent investigation and surveillance. I am unaware of any false or misleading information that CD has provided. CD has been convicted of the felony offenses of theft and conspiracy. CD has not been paid by the FBI for their cooperation.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

("CHS"), who advised they knew PENA-CHAVEZ to be a BTL gang member, a.k.a. "Lonely Girl," and MONTOYA, a West Side Locos gang member, a.k.a. "DEMON." CHS knew PENA-CHAVEZ and MONTOYA to traffic narcotics out of the Subject Premises. During the last month CHS had observed methamphetamine, fentanyl, MONTOYA and PENA-CHAVEZ at the Subject Premises. CHS believed that MONTOYA and PENA-CHAVEZ were convicted felons who had guns at the Subject Premises. Further, CHS was aware that MONTOYA was trafficking large amounts of Fentanyl M30 pills.

28.     CHS also knew PENA-CHAVEZ's daughter, Shantae SAAVEDRA, to traffic crack cocaine. CHS believed PENA-CHAVEZ supplied crack cocaine to SAAVEDRA, however CHS did not know where SAAVEDRA lived or conducted her operations. CHS also knew that SAAVEDRA was a BTL gang member. I reviewed SAAVEDRA's tattoos and observed BTL gang tattoos. CHS also knew that PENA-CHAVEZ and MONTOYA supplied methamphetamine and fentanyl to another BTL gang member.[2]

29.     On December 7, 2022, VGTF agents observed a male wearing a green shirt walk into the neighborhood and into the Subject Premises. A few minutes later, agents observed the front door open and a female stand in the doorway, agents recognized the female as SAAVEDRA. SAAVEDRA stood at the front door for a short time, she was on the phone while she looked at one of the VGTF surveillance units.

30.     Within the last week, agents regularly observed a vehicle registered to PENA-CHAVEZ parked at the Subject Premises. The vehicle may be described as a red Dodge Charger, with NM temp tag 22T039132.

31.     On December 8, 2022, agents observed a van arrive at the subject premises, with NM tag

---

[2] CHS is a close associate to veteran gang members and is an experienced drug trafficker. CHS has provided considerable assistance in multiple other FBI investigations, the information that CHS provided has led to 32 search warrants, 15 arrests, and the seizure of approximately 18 firearms, along with a considerable amount of U.S. Currency and illegal narcotics. CHS is motivated to assist the FBI, in part, because they are hoping to clean up the community and motivated by monetary compensation. I believe the information provided by CHS to be reliable because much of it has been corroborated by independent investigation, controlled drug buys, and surveillance. I am unaware of any false or misleading information that CHS has provided. CHS has been convicted of one felony for a crime of moral turpitude. CHS has been paid approximately $6,050 for their cooperation.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

RDY443 and registered to PENA-CHAVEZ's mother. SAAVEDRA and several females carried bags of suspected groceries into the Subject Premises.

32.     On December 13, 2022, at approximately 3:55 pm agents observed MONTOYA exit the Subject Premises with an item believed to be a firearm. MONTOYA held the long chrome colored suspected firearm under his left arm pointed at the ground, his jacket was unzipped. The manner in which MONTOYA held the suspected firearm is consistent with someone attempting to conceal a firearm and prevented agents from fully observing the item. Shortly before MONTOYA exited the residence a small Honda, NM tag ANPS27, pulled up to and parked at the Subject Premises. The Honda was driven by an unknown female. MONTOYA entered the Honda with the firearm and exited the Honda about two minutes later. When MONTOYA exited the Honda he no longer had the suspected firearm, his jacket was zipped and his hands were inside his jacket pockets. Agents believed he was holding something in his pockets and suspected a transaction occurred, he proceeded back into the Subject Premises. About two minutes later, both PENA-CHAVEZ and MONTOYA exited the residence and entered the Honda. Agents maintained surveillance on the Honda as it went to the Speedway approximately a half mile up the road. The Honda parked at a gas pump but did not get gas, PENA-CHAVEZ exited the vehicle and entered the store. About two minutes later PENA-CHAVEZ exited the store and got back into the vehicle. The vehicle drove back to the Subject Premises, MONTOYA and PENA-CHAVEZ exited the vehicle, again without the firearm, and re-entered the Subject Premises. The Honda left the area at approximately 4:15 pm.

33.     **Indicia of residence**: Agents have observed PENA-CHAVEZ and MONTOYA at the subject premises. PENA-CHAVEZ has the Subject Premises listed in court records and the New Mexico Motor Vehicle Department as her residence of record. A vehicle registered to PENA-CHAVEZ has been observed on several different dates parked out front of the Subject Premises. 911 records reference the Subject Premises as PENA-CHAVEZ's residence.

## **CONCLUSION**

34.     Based on the information contained herein, I submit probable cause exists to search the Subject Premises, more fully described in Attachment A, for the items described in Attachment B, which

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

are evidence, fruits, and/or instrumentalities of, or property intended for use in committing the target

offenses. This affidavit was reviewed by Assistant United States Attorney Paul Mysliwiec.

Respectfully submitted,

Jordan Spaeth
FBI Special Agent

Subscribed telephonically and sworn electronically on December 15, 2022.

HONORABLE B. PAUL BRIONES
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW MEXICO

### ATTACHMENT A
### Person and Premises to be Searched

<u>Premises to be Searched:</u> Subject Premises is located at **1720 Avenida Real Northwest, Albuquerque, New Mexico 87105,** the Subject Premises may be described as light brown and white two-story stucco residence with an attached garage facing the street. The numbers 1720 are posted on the left side of the garage door in the front of the residence.

Color photographs are attached below.



Surveillance photo taken by SA Jordan Spaeth on          Google Earth photo, March 2022
December 7, 2022

The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, and storage containers designated for use by the Subject Premises. The search shall also include vehicles parked at, or in front of, the Subject Premises provided such vehicle has an apparent connection to the Subject Premises. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission or possession of an ignition key.

<u>Biometric Access to Devices:</u> During the execution of the search of the premises described herein, law enforcement officers are also specifically authorized to compel **Defendant** to provide biometric features,

**ATTACHMENT A**
**Person and Premises to be Searched**

including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

1. Any devices found at the premises, and

2. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

3. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the Subject state or otherwise provide the password or any other means that may be used to unlock or access another person's device(s), including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

**ATTACHMENT B**
**Property to be Seized**

The property to be seized includes all evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 Possession with Intent to Distribute Controlled Substances and Conspiracy to Distribute Controlled Substances, 18 U.S.C. §§ 922(g)(1) and 924 Possession of a Firearm and Ammunition by a Convicted Felon; and 18 U.S.C. § 924(c) Possession of a Firearm in Furtherance of a Drug Trafficking Crime to include;

1. Firearms, firearm parts, magazines, and ammunition;

2. Safes and lock boxes;

3. Controlled substances, drug packaging materials, and paraphernalia;

4. Documents, notes, or writings detailing other individuals involved in the distribution of controlled substances and drug ledgers;

5. Large amounts of United States Currency;

6. Cellular telephones;

7. Video surveillance hard drives or storage devices; and

8. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys.